# EXHIBIT D

# (May 8 Letter)

# BARNES & THORNBURG LLP

**Stephen R. Mick**
310-284-3885
smick@btlaw.com

2029 Century Park East
Suite 300
Los Angeles, CA 90067
310-284-3880
310-284-3894 (Fax)

www.btlaw.com

May 8, 2018

Lori Sinanyan
Relativity Media, LLC
RML Distribution Domestic, LLC
9242 Beverly Blvd., Suite 300
Beverly Hills, CA 90210

Re:   Relativity Breaches

Dear Ms. Sinanyan:

We are legal counsel to Netflix, Inc. ("Netflix"), which has asked us to reply to your latest correspondence, which is responsive to Netflix's correspondence of April 4, 2018. We repeat and confirm that Relativity Media, LLC and RML Distribution Domestic, LLC (collectively "Relativity") remain in material breach of the 2010 License Agreement for Internet Transmission (as amended ) (the "License Agreement"). Notably, Relativity's failure to deliver films in 2017 has not changed; and we have confirmed that internet transmission of "*And So It Goes*" further continues in violation of Netflix's exclusive rights.[1]

As Netflix explained in its previous correspondence, these material breaches established claims for compensation against Relativity. Those claims gave rise to certain rights under California law, including a common law right of setoff. Your recent correspondence states that Relativity has filed for bankruptcy (again). This does not undo any prepetition setoffs or recoupments by Netflix. Further, Netflix's ongoing rights of setoff or recoupment, including the right to adequate protection, will be addressed in due course pursuant to applicable bankruptcy law. To the extent that you wish to propose adequate protection for Netflix's setoff claims, please provide us with the details of your proposal, as well as supporting documents demonstrating its adequacy.

With respect to the specific matters raised in your letters of April 25, 2018 and May 4, 2018, please be advised as follows:

---

[1] If Relativity contends that the second availability window for "*And So It Goes*" commenced early, please provide us with a copy of the Notice with respect to the second Start Date.

Atlanta   Chicago   Delaware   Indiana   Los Angeles   Michigan   Minneapolis   Ohio   Washington, D.C.

Lori Sinanyan
May 8, 2018
Page 2


1.  **Section 4.3 – Breach of Exclusivity**

Initially, we note that streaming of five titles on Amazon's service appears unlikely to be the result of "inadvertence." Amazon is a well-established streaming provider, and is unlikely to have made five independent errors with respect to streaming rights, all of which relate to Relativity titles provided to Netflix under exclusive license. In any case, "inadvertence" is not a defense to the breach, as the law and subsequent portions of Section 4.3 make clear.

We acknowledge the provisions in Section 4.3 that limit Netflix's remedies in the event that Relativity is able to cause the cessation of a violation of the exclusivity right. Please provide us with copies of all correspondence between Relativity and Amazon (or Starz) with respect to this issue, including copies of the underlying agreements and whatever basis has been put forward by Amazon (or Starz) for this streaming. To the extent that Relativity is taking the position that this conduct was completely unauthorized in any way, or was the result of third party actions, please provide us with all of the documentation that supports such a position. Irrespective of the foregoing, we note that the License Agreement explicitly permits Netflix to claim and receive damages for such a breach.

We reject categorically your assertion that a breach of the exclusivity provisions on five different titles, stretching for months, is not material. Netflix expressly bargained for two extended periods of streaming rights, with exclusivity throughout the entirety (including the time between availability periods). The total amount of time granted to Netflix was 30 months – 18 months in the first window, and 12 months in the second window. Netflix would not have agreed to pay a premium price for these rights without the assurance of full exclusivity. Thus, on a simple "but for" test, Netflix would never have entered into the Licenses for these films at all if informed in advance that its rights would not be exclusive. This, alone, demonstrates the materiality of the breach. Here, however, the breach is aggravated by the fact that it occurs on five different titles, and that the beneficiary of the breach is Amazon, one of Netflix's most significant competitors.

Recognizing that there has been partial performance, at least through the first access period, Netflix opted not to value its damages under a rescission-type theory for these titles (which would have been the full contract price of $31.5 million). Instead, Netflix believes that the appropriate valuation is a pro rata allocation based on the amount of remaining time in the License period (which here is the second window), or 40% of the total. A pro rata allocation of damage is supported by the language of the License Agreement (specifically §4.6 and §9.3). This claim for $12,612,188 represents the pro rata portion of the License period for

Lori Sinanyan
May 8, 2018
Page 3

which Netflix will not receive what it bargained for: an exclusive right to stream a title that consumers could not stream on a competing service.

**2.    Section 9.2 – Failure to Deliver Theatrical Titles**

We recognize, of course, that the License Agreement does not make the delivery of the minimum Title amount in any given year an absolute covenant of Relativity; instead, the License Agreement contains an agreed-compensation amount for each film that Relativity fails to deliver - $5 million. It is inarguable that Relativity failed to deliver any films in 2017 (although, as we noted, Relativity gave notice in 2017 of three acquisition titles that were released late that year, but delivered to Netflix in 2018).

We also recognize that the License Agreement contains an exception clause that exempts Relativity from the agreed-compensation amount *if, but only if,* Relativity can establish that it was unable to finance, produce and/or distribute the required Titles despite "good faith efforts." Relativity's obligation under the License Agreement was to pay the agreed-compensation amounts by January 30, 2018. It did not do so. To date, Relativity has made **no showing of any kind** that it was *unable* to finance, produce and/or distribute **any** films in 2017 despite good faith efforts. To be clear, because the agreed-compensation amount applies each Calendar Year, on a per-film basis, we are not asking Relativity to demonstrate why it could not deliver 15 films; Netflix is asking Relativity to justify why it could not deliver **one** film (or two).[2] Moreover, "unable" is not the same as "chose not to in order to maximize other revenues." Having failed to make such a showing (or even to make the claim on a timely basis), Relativity remains in breach for failure to pay the agreed-compensation amount for each film it failed to deliver and for which it cannot demonstrate a legitimate, contractually authorized excuse.

Predictably, you have cited to the finding of the Bankruptcy Court with respect to Relativity's efforts in 2015. We acknowledge, as we must, that the Bankruptcy Court found that Relativity's efforts in 2015 were adequate to exempt Relativity from the minimum Title compensation payments at that time. But efforts in 2015 are not the same as efforts in 2017, and the Bankruptcy Court's finding at that point in time has no bearing on whether Relativity did enough (or did anything) in 2017. It is our view that Relativity has made no showing at all, and thus that it remains obligated to Netflix for the agreed-compensation amount on one or more undelivered films.

---

[2] It is probably unnecessary to address the question of whether Relativity could have or should have delivered three or four titles, but Netflix reserves the right to address that issue at a later time.

Lori Sinanyan
May 8, 2018
Page 4

### A. The Promised Titles

Of some significance here is the fact that in 2016, as part of its confirmation proceeding (and then again in May 2016 in a post-confirmation proceeding), Relativity explicitly represented to Netflix and the Bankruptcy Court that it had a slate of films that it would release in 2016, 2017 and 2018, and deliver to Netflix. The full list of 22 films is an exhibit to the Declaration of Marni Wieshofer [Docket 1641, p. 13, attached hereto as Exhibit A], and was referred to extensively by Relativity throughout the Bankruptcy Court proceedings. The list includes several films that were already completed, and for which no additional production financing was required (*e.g., Kidnap, Solace*), as well as titles that were in some stage of development. In order to obtain substantial relief and benefits from the Bankruptcy Court, Relativity represented (through the testimony of Ms. Wieshofer and others) that it would deliver six Titles in 2016, eight Titles in 2017, and eight Titles in 2018. (*See* Exhibit A hereto).

Thus, for starters, Relativity must demonstrate that despite good faith efforts, it could not have delivered to Netflix at least two films that were already finished and ready for release, or for which Relativity did not have to incur material production costs.[3] *Kidnap* and *Solace* are obvious examples; but also on Relativity's Film Release Schedule were *Hunter Killer, Not Without Hope, Act of Valor*, and *High Noon,* among others. Despite its representations in the Bankruptcy Court, at no point did Relativity offer any of these films to Netflix. Instead, Relativity opted to give these films to competitors: Lionsgate (*Solace*), Aviron Pictures (*Kidnap*), and Summit (*Hunter Killer*), for example, rather than deliver them to Netflix. Indeed, Relativity did not even approach Netflix to discuss the films, despite the fact that Netflix had the resources to acquire or finance any of these projects. This is precisely the kind of unilateral decision to steer titles away from Netflix that triggered the agreed-compensation payment under the License Agreement.

### B. Acquisition Titles

In addition to already-produced titles, Relativity must explain why it could not have obtained and delivered acquisition titles in 2017. The scope of Relativity's actual effort is unclear, but

---

[3] Relativity, of course, represented to the Court (and the world) that it had sufficient funds and available capital to continue as a going concern, else it would not have been permitted to emerge under Chapter 11. Indeed, by way of example, the Bankruptcy Court filings reference the availability of many tens of millions of dollars in funds for prints and advertising on these movies.

Lori Sinanyan
May 8, 2018
Page 5

Relativity has the burden of demonstrating that it was somehow unable to make any deals whatsoever. During the relevant period of time, there were several fully-produced titles available in the marketplace that we believe were likely shopped to Relativity. To the extent that Relativity was offered the opportunity to acquire these films for 2017 delivery, Relativity's refusal or inability to do so requires some explanation. Accordingly, please provide us with documentation concerning any negotiation, offers or other discuss between Relativity and the third-party producers of potential acquisition titles that would have been available for delivery in 2017.

      C.      **Sources of Financing for Producing or Acquiring Titles**

As you know, Relativity represented to the Bankruptcy Court that it had abundant available capital that would allow it to produce the films identified by Ms. Weishofer. (Ms. Weishofer herself makes this representation several times in her testimony; *see, e.g.,* Docket 1641, p. 6). Indeed, Relativity's experts repeatedly assured the Bankruptcy Court that it not only had the funds to emerge from Chapter 11, but that the identified films (including those already produced) would produce significant profits. The exhibit prepared by Ms. Weishofer represents that the first six films alone (all of which were fully completed and show no projected production costs) would generate total profits of more than $140 million. *See* Exhibit A hereto. Relativity told the Bankruptcy Court that it would make a material profit on every single one of those first six films, each of which it said would be released in 2016. *Id.*

In September 2016, as you are well aware, Relativity commissioned a valuation study of the company from Duff & Phelps. That study valued the company on a discounted cash flow basis at approximately $66 million. (September 9, 2016 Valuation Report, Ex. 1, p.1). This valuation was based on a library film revenue analysis that showed a total pre-tax value of $89.5 million. (Id., Ex. 5, p.2). Duff & Phelps projected individual film cash flows and a total company cash flow on a yearly basis that totaled over $20 million gross between mid-2016 and the present, with a net, after costs, overhead and tax, of more than $12 million. (Id., Ex. 4, p.2).

The Duff & Phelps analysis was used as part of Relativity's own statements to actual and prospective investors in at least October and November 2016. Relativity's written presentation to investors confirms projected 2017 net cash flow, after all costs and overhead, of $11.7 million. (October 2016 Relativity Media, LLC presentation materials, p.32). In conjunction with these investor presentations, Relativity further announced that it had obtained significant investment funding from Singapore-based public company Yuuzoo. The

Lori Sinanyan
May 8, 2018
Page 6

formal securities filing made with the Singapore stock exchange states that Yuuzoo would receive a 33% stake in Relativity in exchange for a total of $50 million in cash and stock. Internally, Ryan Kavanaugh reported to counsel for Anchorage Capital that this deal would yield $30 million for Anchorage and $20 million in operating capital for Relativity. (Kavanaugh email to Mark Shinderman, October 19, 2016).

In view of all of these written assessments of Relativity's financial means and backing, Relativity's current professed lack of capital or assets raises an obvious question: Where did all of these sources of money go?

In order to demonstrate that Relativity has actually used good faith efforts to obtain financing for production, acquisition or distribution, we believe that Relativity must, at a minimum, provide evidence of:

1) Its financial status throughout the relevant period, including its balance sheets and cash flow statements for each month during the period.

2) Its efforts to raise funding through equity investment, including each of its presentations to potential investors.

3) Its efforts to raise funds through asset sales, including the correspondence and documentation associated with the fall 2016 offers to sell, and any offers received from, among other people, Lionsgate and Qualia Capital/Amir Malin.

4) Its negotiations with Yuuzoo over the publicly announced investment deal, and any documentation relating to that investment.

To be clear, it is our view that Relativity has not met the contractual requirement to show that it was unable to deliver a single film to Netflix in 2017 despite its "good faith efforts." Relativity must show that it took reasonable steps to raise funds through such investment efforts, and did not waste its income or assets on unrelated activities. Further, while we believe that the scope of Relativity's obligation under the agreed-compensation clause extends more broadly, we have chosen to focus attention on Relativity's failure to deliver the eight (8) Titles it promised Netflix and the Court it would deliver in 2017. If Relativity cannot meet its burden of establishing that it was unable to deliver even two (2) such Titles, for example, the agreed-compensation clause obligates Relativity to pay Netflix $10 million.

Netflix continues to assert that Relativity is in material breach of the License Agreement, and that Relativity owes Netflix $12.7 million for breach of the exclusive rights provisions, and

Lori Sinanyan
May 8, 2018
Page 7

at least $10 million, but potentially as much as $25-50 million, in agreed-compensation for failure to deliver the required films.

3.   **The Existing Setoffs**

Your May 4, 2018 correspondence asserts that Netflix has failed to pay roughly $1 million in connection with the License Fee for *A Question of Faith*. Your letter simply fails to understand the import of Netflix's prior correspondence regarding Relativity's financial obligations to Netflix, and the manner in which California law excuses performance and gives rise to rights of setoff. Relativity presently owes Netflix more than $20 million in various judgments, damages and contractual compensation. As noted above, the outstanding damages that Relativity owes to Netflix for breach of the exclusivity covenant in connection with five films is approximately $12.7 million. As also noted above, the contractual agreed-compensation payments for failure to deliver promised titles to Netflix total at least $10 million. Finally, the Santa Clara Superior Court awarded Netflix approximately $93,000 in fees and costs in the fall of 2017 in connection with Relativity's failed state court complaint. With interest, that judgment now amounts to approximately $100,000.

For the foregoing reasons, the demands in your May 4, 2018 correspondence are rejected in total. (Your various attempts to go outside the scope of the remedies permitted in the License Agreement, as well as under California law, and somehow bootstrap a routine setoff situation under California law into some other type of claim is equally baseless.)

As you would expect, Netflix reserves all of its rights and remedies in connection with the License Agreement and Relativity, whether or not explicitly referenced herein.

Sincerely,

Stephen R. Mick

cc:    Bryony Gagan

**Film**
**Release Schedule**
*($ in thousands)*

| Film | Title | Release Date | Total Lifetime Revenue[1] | Distribution Costs[2] | Net Production Costs[3] |
|---|---|---|---|---|---|
| 1 | Kidnap | Aug-16 | $93,027 | ($56,880) | - |
| 2 | Solace | Sep-16 | 37,820 | (28,821) | - |
| 3 | Masterminds | Sep-16 | 130,090 | (78,729) | - |
| 4 | Before I Wake (Somnia) | Oct-16 | 64,062 | (42,208) | - |
| 5 | TBD Acquisition 1 | Oct-16 | 56,760 | (41,244) | - |
| 6 | Disappointments Room | Dec-16 | 72,621 | (58,450) | - |
| 7 | Strangers 2 | Feb-17 | 60,394 | (51,450) | 3,457 |
| 8 | Not Without Hope | Feb-17 | 98,659 | (80,010) | 7,460 |
| 9 | Hunter Killer | Apr-17 | 143,467 | (113,161) | - |
| 10 | Act of Valor: SWAT | May-17 | 91,197 | (81,663) | 1,928 |
| 11 | TBD Acquisition 2 | Sep-17 | 56,760 | (41,244) | - |
| 12 | High Noon | Oct-17 | 98,659 | (80,010) | 7,460 |
| 13 | TBD Acquisition 3 | Nov-17 | 56,760 | (41,244) | - |
| 14 | TBD Acquisition 4 | Dec-17 | 56,760 | (41,244) | - |
| 15 | Immortals 2 | Mar-18 | 162,437 | (130,822) | 14,316 |
| 16 | TBD 2018 1 (Not Without Hope Model) | Apr-18 | 98,659 | (80,010) | 7,460 |
| 17 | TBD 2018 2 (Hunter Killer Model) | Apr-18 | 143,467 | (113,161) | - |
| 18 | TBD 2018 3 (Act of Valor: SWAT Model) | May-18 | 91,197 | (81,663) | 1,928 |
| 19 | TBD 2018 4 (TBD Acquisition 1 Model) | Jun-18 | 56,760 | (41,244) | - |
| 20 | TBD 2018 5 (High Noon Model) | Sep-18 | 98,659 | (80,010) | 7,460 |
| 21 | TBD 2018 6 (TBD Acquisition 2 Model) | Dec-18 | 56,760 | (41,244) | - |
| 22 | TBD 2018 7 (Immortals 2 Model) | Dec-18 | 162,437 | (130,822) | 14,316 |

*Note: Release schedule per management.*
*(1) Includes first cycle revenues (theatrical, home entertainment, Pay TV, PPV, Free TV and other revenue) and library value.*
*(2) Includes P&A, third-party distribution fees, participations, residuals, third-party shares and other costs.*
*(3) Film budget net of equity, pre-sales, overages, foreign excess collateral and soft money; for completed films all net production costs incurred prior to exit.*

5