# EXHIBIT F

# (May 21 Letter)



May 21, 2018

<u>By Email and Federal Express</u>

Stephen R. Mick
Barnes & Thornburg LLP
2029 Century Park East, Suite 300
Los Angeles, CA  90067

Re:  Netflix's Failure to Make Payment for *A Question of Faith* and Relativity's Alleged Breaches

Dear Mr. Mick:

I am writing on behalf of RML Distribution Domestic, LLC (together with its affiliates, "Relativity") in response to your letter of May 8 as counsel for Netflix, Inc. ("Netflix").  In your letter, you claim that Netflix is entitled to withhold the $1,000,313.10 license fee payment due to Relativity with respect to the film *A Question of Faith* as a setoff against damages resulting from purported breaches of the 2010 license agreement between Netflix and Relativity (as amended, the "License Agreement").  There have been no such breaches, as Relativity previously made clear, and nothing in your letter suggests otherwise.

Accordingly, Relativity renews its demand for immediate payment of the license fees that are owing for that film.  As further described herein, Netflix also must pay Relativity $622,049.36 in license fees owing in two days, on May 23, for *The Stray*, as well as payments for other films due thereafter, and respond to Relativity's repeated requests to open Netflix's backlot for the film *Samson*, the start date notice for which was delivered by Relativity to Netflix on April 30.

1. <u>Alleged Breach of SVOD Exclusivity Rights</u>

It is well established that a party claiming breach of contract and damages has the burden of proving the breach and the quantum of any resulting damages.  Under California law, which you invoke and which governs the License Agreement, this remains the case for a party seeking to use such a claim as a basis for setoff.  *See Textron Fin. Corp. v. Nat'l Union Fire Ins. Co.*, 118 Cal. App. 4th 1061, 1077 (2004); *Conrad v. Ball Corp.*, 24 Cal. App. 4th 439, 444 (1995); *Frankfort Marine Accident & Plate Glass Ins. Co. v. Cal. Artistic Metal & Wire Co.*, 28 Cal. App. 74, 85-86 (1915).  Netflix has not met its burden and cannot do so.

    a.  <u>Third Party Actions and Relativity's Response to Netflix's Breach Notification</u>

Contrary to the suggestion in your letter, Relativity has never claimed that any streaming of the films at issue during Netflix's exclusivity periods was the result of inadvertence on the part of Amazon or Starz. The third party with whom Relativity had a contractual relationship to which Relativity was referring in prior correspondence with respect to three of the films at issue was Macquarie Investments US Inc. ("Macquarie"). The films in question are *The Lazarus Effect, The Woman in Black 2: Angel of Death*, and *Beyond the Lights*. Relativity had a funding agreement with Macquarie secured by rights in these three films. Although Relativity repaid a substantial portion of the moneys loaned, it was unable to timely repay the balance. As a result, in April 2017, Macquarie foreclosed on the films pursuant to the funding agreement. Thereafter Macquarie – and not Relativity – controlled the distribution of these films.

Relativity informed both Macquarie and its distributor, Samuel Goldwyn Films, that Netflix had rights under the License Agreement with respect to these three films. In fact, we understand that a representative of Samuel Goldwyn Films, specifically told Netflix that Samuel Goldwyn films wanted to honor any rights that Netflix has with respect to the films and inquired as to whether Netflix wished to avail itself of any rights it might have. In responding, Netflix deferred answering that question and Samuel Goldwyn Films thereafter concluded – rightly or wrongly – that it could make the films available on Amazon Prime on an SVOD basis. The first that Relativity learned this had occurred was as a result of Netflix's April 4, 2018 letter informing us there was an issue with the films. Relativity forthwith reached out to Macquarie and Samuel Goldwyn Films and had the films taken down from Amazon Prime within hours. As a result, we understand that *The Lazarus Effect* was available on Amazon Prime for only 20 days, *Woman in Black 2: Angel of Death* for only 16 days and *Beyond the Lights* for only 34 days. None of these films were ever available on Starz.

In the case of the remaining films at issue, the third party to which Relativity was referring in prior correspondence was Relativity Europacorp Distribution ("RED"), a joint venture between Europacorp and Relativity.[1] For the film *And So It Goes*, as reflected in RED's records and understood by Relativity, Netflix's second licensing window was to be September 18, 2016 to September 17, 2017. Relativity delivered the film to Starz for airing starting September 18, 2017, believing Netflix's window to have concluded on September 17, 2017. However, as Relativity discovered upon investigation after receiving Netflix's April 4, 2018 letter, unbeknownst to Relativity, RED had designated a different, later window to Netflix, from March 1, 2017 to February 28, 2018. Accordingly, for a portion of this period – less than half of it – the film was available on Starz. Contrary to Netflix's April 4 letter, the film was not made available on any SVOD service between Netflix's first and second licensing windows. And contrary to the suggestion made in your letter, there is no ongoing violation of any Netflix rights

---

[1] RED is not an Affiliate of Relativity under the License Agreement because Relativity has a 50/50 participation with Europacorp and does not have control. In addition, in the wake of Relativity's inability to make a required payment in 2016, Relativity lost co-management and board rights in the venture.

2

because Netflix's window closed months ago.  The notice to Netflix designating the dates of the March 1, 2017 – February 28, 2018 window was sent by email from Brendan Kelly of RED to Rob Roy (with no Relativity employees copied) on October 11, 2016 at 5:57 p.m., and we would be happy to provide you with a copy if your client is unable to locate it.

Finally, with respect to the film *Hector and the Search for Happiness*, RED's records indicate and Relativity understood that the second Netflix licensing window was to be December 3, 2016 to December 2, 2017.  Based on that, Relativity delivered the film to Starz for airing beginning thereafter, on December 3, 2017.  Upon investigation after receiving Netflix's April 4 letter, Relativity was unable to locate any designation to Netflix of the second window as contemplated, or indeed designation of any second window (if Netflix is aware of such a designation please let us know).  As such we may be in the exclusivity period between windows for this film, which is what Netflix claimed in its letter.  Based on that, Relativity proceeded forthwith to have the film taken down from Starz, and it was taken down on April 16, twelve days after notice from Netflix.

      b. Netflix's Damages Claim

As reflected above, in the case of each film referenced by Netflix, any violation of Netflix's exclusivity rights was the result of actions by third parties.  Upon being advised of the issue by Netflix, Relativity promptly took steps to cause any such violation to cease.  Under the circumstances, pursuant to Section 4.3 of the License Agreement any such violation cannot be deemed a material breach that would have given rise to a termination right.  That is so by virtue of Relativity having used commercially reasonable efforts to cause the cessation of any violations.  Here, not only did Relativity make such efforts, but those efforts were successful.  Netflix also would be prohibited from rescinding the License Agreement at this point by the automatic stay in bankruptcy.  Given Section 4.3 of the License Agreement and the automatic stay, your claim that Netflix would be entitled to damages equivalent to rescission for material breach, as one might seek in the case of an actual termination, is meritless.  Under California law, if a contract is not terminated, only ordinary damages are available.  *See Elworthy v. Spiva*, 2013 WL 5934650, at *7-9  (Cal. App. 6th Dist. Nov. 6, 2013); *Akin v. Certain Underwriters at Lloyd's London*, 140 Cal. App. 4th 291, 298 (App. 4th Dist. 2006).

Despite the unavailability of rescission and despite your purporting to forego rescissionary-type damages, to which Netflix would not be entitled in any case, rescissionary-type damages is in fact what you demand.  Specifically, Netflix seeks a pro rata allocation based on the amount of time remaining in the license period as specified in Sections 4.6 and 9.3 of the License Agreement.  That is a rescissionary payment to be made in the event Netflix terminates,[2] which is precisely what Netflix is not entitled to do given Section 4.3 of the License

---

[2] The proportional payment provided for in Sections 4.6 and 9.3 is equal to the full amount of license fees paid by Netflix less an amount corresponding to how much time Netflix had to make use of the films.  That type of netting would be required in calculating the amount due upon rescission to account for value received.  *See Runyan v. Pacific Air Indus, Inc.*, 76 Cal. Rptr. 701, 704 (App. 5th Dist. 1969).  Contrary to the assertion made in your letter, rescission does not simply call for return of "the full contract price."

3

Agreement and the automatic stay.  Return of a proportional amount of fees based upon how much of Netflix's Availability Periods is left may make perfect sense in the event of a termination, because in that case Netflix is foregoing the remainder of such periods.  It makes no sense here because Netflix is not terminating and cannot terminate, so it will have full use of what remains of the periods.

All that occurred here was that Netflix did not have exclusivity for a matter of a few weeks for three films and a few months for two others.  That is not significant given the total amount of time that Netflix has had and will have exclusivity for these and other films, and given the realities of the industry's and Netflix's business models.  Under the License Agreement, Netflix is entitled to SVOD exclusivity for films during four periods of time, two of which permit streaming and two of which are blackout periods:

- the period before a film is first made available to Netflix, which might last for up to a year after its initial theatrical release;

- Netflix's first Availability Period window of eighteen months during which it first has access to the film;

- the period between the end of this window and the commencement of the second window, which could be up to six years; and

- the second Availability Period window of twelve months.

In the case of each of the films, only a portion of only one of these periods was implicated.  What is more, in the case of all but two of the films no exclusivity violation occurred during an Availability Period when Netflix could actually *stream* the film.  In both of those cases the film was available on another provider for less than half the period – in one case for less than three weeks – and it is not as though Netflix had no rights even then, inasmuch as Netflix was entitled to show the film throughout the period.

Moreover, Netflix was fully in control of how long the inadvertent non-exclusivity lasted.  A contract party cannot sit on its rights and it must take all reasonable steps to mitigate any harm to it by reason of a violation.  *See* 1 Witkin, Summary of California Law, I.XV.D. Mitigating Damages, § 944 – In General (11th ed. 2017).  Given the importance of exclusivity asserted by Netflix, and its claim that the film was shown by "one of Netflix's most significant competitors," Netflix should have been promptly aware that there was a violation.  Relativity acted rapidly to cure any violations when called to its attention, and so Netflix has only itself to blame for the duration of any such violations, brief though they were.

The prospect that Netflix has suffered any damages is further belied by the industry's and Netflix's business models.  The service at issue here is SVOD – Subscription Video on Demand – whereby subscribers pay a monthly flat rate for unlimited access to a wide range of programs.  There is simply no way that Netflix can make a straight-faced claim that it lost sales

4

for any such service by virtue of not having exclusivity for brief periods of time as to a few films. That is all the more so given the fact that it is not unusual today for films to appear on multiple services. And it is even more so given the particularities of Netflix's own business model. It is no secret that in recent years Netflix has focused on TV programming rather than movies, and that the movies it streams are increasingly original ones rather than those acquired from third parties like Relativity. *See* http://www.businessinsider.com/netflix-movie-catalog-size-has-gone-down-since-2010-2018-2. Indeed, in the case of the one movie at issue that was shown on another platform during a Netflix Availability Period for more than a few weeks (although less than half the period), Netflix apparently did not care enough about showing the film itself to even be aware of when the period was, and as such may not have even shown the film at all.

Given all of the above, there is simply no way that Netflix would be able to carry its burden of demonstrating that there was any material violation of the License Agreement as a result of the brief loss of exclusivity for these few films. In addition to the aspects of Section 4.3 discussed earlier, that provision also makes clear that immaterial violations do not give rise to any damage claim, and do not even constitute breaches. Netflix knows full well that it suffered no damages here. Accordingly, it has no right whatsoever to withhold payments indisputably owing to Relativity on the basis of any purported exclusivity breach.

2. Relativity's Alleged Failure to Pay Penalties for Minimum Output

Your letter acknowledges that if the number of films financed, produced and/or distributed by Relativity is insufficient to meet the minimum requirements owed to Netflix in the License Agreement for a given year despite Relativity's good faith efforts, Relativity owes no penalty payment under Section 9.2 or any other damages under the License Agreement. Netflix's letter of April 4, 2018 asserting failure by Relativity to pay penalties for 2017 did not claim that Relativity had a sufficient number of films to meet the minimums for that year, or that Relativity's not having a sufficient number of films was the result of bad faith. There can be no penalty owing unless either was the case.

   a. Netflix's Burden of Proof

You appear to justify having ignored this by asserting that even though Netflix is the one claiming a breach by Relativity, it is *Relativity's* burden to "make a showing" that it did not in good faith have the films. That is demonstrably not true. California law makes clear that where the existence of a breach turns on whether a party exercised good faith and due diligence to fulfill contractual requirements, the burden remains on the party claiming breach to establish the other party's failure to do so. *See Abrams v. Motter*, 3 Cal. App. 3d 828, 838 (1970). That is particularly so here, where the parties to the License Agreement clearly knew how to impose the burden on Relativity of establishing compliance when they wanted to do so, and they did not do so in this case. Thus, in the case of a different exception to the minimums requirement – if Relativity licenses television, theatrical and home video distribution rights in a film to another party – Section 9.2 provides that Relativity must "reasonably document" the existence

5

of the license. No such requirement, or any other requirement, is specified in a case where Relativity in good faith simply lacked the requisite number of films.[3]

    b. <u>Relativity's Designation of Three Films for 2017</u>

Despite Netflix improperly attempting to shoulder Relativity with the burden of proof here, Relativity plainly would satisfy that burden as Netflix articulates it. According to your letter, Netflix is "not asking Relativity to justify why it could not deliver 15 films [per the License Agreement]; Netflix is asking Relativity to justify why it could not deliver **one** film (or two)" (emphasis in original). In fact, however, Relativity delivered *three* films for 2017: *A Question of Faith*, *Same Kind of Different as Me* and *The Stray*. Netflix seeks to avoid this by suggesting films for 2017 were required to be delivered that year rather than, as was the case, early in 2018. That is clearly not so. Section 4.1.1. of the License Agreement calibrates the minimum number of films due for each calendar year to the year in which the films' "initial theatrical released date occurred," not the date of delivery to Netflix. Your letter acknowledges that the three acquisition titles delivered to Netflix for 2017 were indeed released late that year. Nothing in the License Agreement calls for delivery to be made during the year of release. Indeed Section 4.1.1. calls only for Relativity to "designate" the films for license, and does not even require the designation to be made in the release year (although all three of the films were in fact designated by Relativity in 2017). Nor would it make sense to call for delivery of each film in the year of its release. Section 4.4.2 of the License Agreement does not require the first Netflix Availability Period for a film to begin until up to a year after its release.[4]

    c. <u>Prior Proceedings and Relativity's List of Projected Releases</u>

In response to Netflix's letter of April 4, Relativity pointed out that the Bankruptcy Court recognized at the February 2016 confirmation hearing that nothing suggested Relativity's anticipated failure to make the minimums for 2017 would be in bad faith, and that in fact heroic efforts had been made by Relativity to try to put its business back together. You argue that this only related to whether Relativity's efforts were adequate to exempt Relativity from the minimum compensation payments "at that time" – referring to 2015 – and that it has no bearing on whether Relativity made sufficient efforts in 2017. But in fact the Court's discussion at the confirmation hearing related to Relativity's potential failure to meet the minimums *for 2017* (and 2016), inasmuch as Relativity was anticipating even back then that it would fail to do so. Looking forward, the Court recognized that Relativity would be facing financial challenges, climbing out of bankruptcy and attempting to reestablish its reputation in the market place, despite having made strides in doing so. (Feb. 2, 2016 Transcript p. 84-85, ll. 23-24, 1-2.)

---

[3] For the same reason, there is no basis for your additional assertion that Relativity failed to make the purportedly required showing of good faith "on a timely basis." No such showing by Relativity was required at all, much less by some unspecified time.

[4] Even if delivery were required in the referenced year, which it is not, then both *Masterminds* and *The Disappointments Room* – which were theatrically released in 2016 but delivered to Netflix in 2017 – would count towards the minimum for 2017.

6

Your letter also asserts that Relativity previously represented to Netflix and the Bankruptcy Court that it had a slate of films it would release in 2016-2018 and deliver to Netflix, referring to the film release schedule with revenue and cost figures in Exhibit A to the Declaration of Marni Wieshofer of Houlihan Lokey Capital, Inc. ("Houlihan"), Relativity's financial advisor.  However, neither Ms. Wieshofer nor Relativity ever said that the release and delivery to Netflix of even those films – which still would leave Relativity short of the minimum – was assured.  Rather, Ms. Wieshofer made clear that Exhibit A consisted of projections.  *See* Decl. at p. 3.  As the following reflects, there is no basis to claim that Relativity acted in bad faith with respect to the specific films on Exhibit A that you question or any other films on the list that ultimately Relativity did not theatrically release:

- *Kidnap* – Pursuant to the prior bankruptcy Plan of Reorganization (the "Plan"), Relativity assumed the license agreement it had entered into for this film, paying $150,000 as part of its cure obligation.  It also entered into a financing note that required a domestic theatrical release on or before December 31, 2016, which Relativity was unable to meet because it could not obtain financing to pay for printing and advertising ("P&A") required to release the film theatrically.  Accordingly, in May of 2017 the financing party foreclosed on Relativity's rights.

- *Before I Wake* – Also pursuant to the Plan, Relativity assumed the license agreement it had entered into for this film and entered into a financing note that required a domestic theatrical release on or before December 31, 2016, which it was unable to meet because of its inability to raise P&A financing for a theatrical release.  Accordingly, in May of 2017, the financing party foreclosed on Relativity's rights.

- *Solace* – Despite expending millions of dollars, Relativity was unable to meet the monetary obligations under the assumption agreement for theatrical release of this film and its rights were accordingly terminated in July of 2016.  Relativity had acquired only the U.S. rights, which were of limited value because of the film's prior release in foreign territories, and in fact the film was never theatrically released in the U.S.

- *TBD Acquisitions 1, 2, 3 and 4* [5] – These forecasted releases were for unidentified titles intended to be acquisitions Relativity would make with sufficient liquidity.  In the absence of a successful capital raise (efforts for which are discussed below), these acquisitions were not made.

- *Strangers 2* – Given its limited financial resources, Relativity engaged in several discussions with prospective co-finance partners in an attempt to proceed with production of this film.  Due to obligations to its senior lenders to make a principal payment and the need for additional operating capital, Relativity was forced to sell its rights in the film to another producer.

---

[5] TBD Acquisitions 5-7 relate to 2018.

7

- *Not Without Hope* – Despite securing the underlying book and life rights, and commissioning a writer for a screenplay, Relativity was not able to proceed with production due to limited financial resources.

- *Hunter Killer* – Relativity was unable to make, by the relevant deadline in the assumption agreement (end of May 2016), the required $8 million minimum guarantee payment to the film producer on which Relativity's acquisition of U.S. distribution rights was conditioned. Relativity accordingly lost distribution rights in this title.

- *Act of Valor: SWAT* – Relativity still retains the rights to make this film and hopes to develop and produce it in the future when it has sufficient capital.

- *High Noon* – Although Relativity secured the remake rights to this film and solicited co-finance partners to proceed with production, lack of capital led to expiration of the film rights and no production.

- *Immortals 2* – Relativity still retains the rights to make this film, recently paying $50,000 to extend its option, and has plans to develop and produce the film in the future when it has sufficient capital.

Contrary to your claim, in none of these cases or any others, did Relativity opt to give up its distribution rights to Netflix's competitors, and you provide no basis for any such claim. Moreover, although you state that production had been materially completed for some (but not most) of these films, that entirely overlooks the substantial, eight-figure costs – including P&A funding requirements.

    d.  Relativity's Good Faith Efforts to Raise Capital

There is no basis for your suggestion that Relativity not having released the foregoing films or, obtained and released others, was the result of bad faith. In connection with its emergence from bankruptcy on April 14, 2016 (the "Effective Date"), Relativity made clear in the financial assumptions it had submitted to the Bankruptcy Court that it would need to raise $100 million of equity. As described below, and in further detail in my declaration of May 8, 2018 submitted in the current bankruptcy proceedings (at Docket 8), since Relativity's emergence from bankruptcy, Relativity engaged in multiple capital raise activities in order to execute on the Plan.

On April 6, 2016, Relativity engaged Houlihan as its exclusive placement agent for possible placement of over $100 million in equity or equity-linked securities. In May 2016, immediately following the Effective Date, Relativity engaged EMP Media Partners LLC ("EMP") and Aperture to source and secure a $100 million revolving credit facility, of which the primary use of proceeds was intended for financing release and distribution activities (including P&A expenditures). Both Houlihan and EMP/Aperture contacted a number of financing institutions,

8

distributed materials and held discussions with numerous prospective investors, lenders and/or buyers.  Some lenders expressed interest and performed diligence, and then indicated an intent to commit funding contingent on sufficient equity capital to support the Plan and/or resolution of the outstanding litigation with Netflix.  However, it took until August 22, 2017 to dispose of that litigation due to Netflix's pursuit of its meritless claims through the appeal process.

Once it became clear that the intended debt facility would not be closed and funded in time to release the films on their scheduled dates, Relativity engaged other sources of potential financing, both on an overall lending facility basis and on an individual film-by-film basis.

- June 2016 – Relativity entered into discussions with a lender for financing for the release of *Kidnap*.

- July 2016 – Relativity entered into discussions with another lender regarding financing for *Before I Wake*, *Masterminds*, *The Disappointments Room* and *Kidnap* and additional financing for up to 10 films.

- September 2016 – Relativity closed financing for the theatrical release of *Masterminds* on 09/30/2016.  It used its line of credit with Carat to fund all of the pre-release media spend necessary to give *Masterminds* and *The Disappointments Room* a proper release – an over $40 million total P&A budget.

In the process of releasing *The Disappointments Room* and *Masterminds*, which it was able to do on or ahead of the anticipated timetable, Relativity exhausted one of its primary sources of financing – the Carat media line of credit – and therefore could not utilize that as a source for releasing future films.  The valuation study you describe by Duff & Phelps was based on, as you note, an analysis of Relativity's film library revenue.  However, that revenue already secured Relativity's existing Midcap facility.  As for the hoped-for Yuuzoo financing you also reference, that fell through when Yuuzoo ended the transaction.  Nonetheless, Relativity continued to aggressively pursue capital raise alternatives including, but not limited to, a sale of the existing film library in the hope of generating sufficient liquidity over and above the amount that had been needed to secure Relativity's Midcap facility.  None of these efforts, however, was successful.

As noted earlier, Relativity is under no obligation to prove to Netflix that it acted in good faith.  As such there is no justification for the open-ended demands in your letter for documentation concerning Relativity's communications with third parties, efforts to raise funding or its financial status.  Netflix had no grounds whatsoever to conclude that Relativity's inability to provide the requisite number of films under the License Agreement was in bad faith, and it therefore had no basis to set off any penalty amount against the moneys owed by Netflix to Relativity.

3. <u>Netflix's Purported Setoff and Course of Conduct</u>

9

Netflix's claims of breach and damages are entirely specious, and its withholding payment of the amounts it owes Relativity on that basis is not a "routine setoff situation under California law" as you claim. The proper legal term for what Netflix is doing is "conversion," misappropriation of property indisputably belonging to another. As described in Relativity's letter of May 4, 2018, Relativity reserves all of its rights for the substantial damage caused by Netflix's actions.

We have seen this movie before. Time and again, Netflix has raised baseless arguments under the License Agreement in an effort to place roadblocks in Relativity's path. In the last bankruptcy, for example, Netflix made the patently untenable claim – summarily rejected by the Bankruptcy Court – that Netflix would be entitled to additional remedies beyond those to which it is expressly limited in the event Relativity fails to meet the minimums requirements. Netflix also took the plainly unsupportable position that it could begin streaming Relativity films before their theatrical release, a position that was rejected not only by the Bankruptcy Court, which found that Netflix had not acted in good faith, but also by the District Court and the Second Circuit in meritless appeals that Netflix required Relativity to litigate.[6]

Netflix's motives are obvious. Having entered into the License Agreement almost ten years ago when it was not the film-streaming behemoth it is today, Netflix wants to apply pressure on Relativity to renegotiate the License Agreement on terms more commensurate with those it can extract from other distributors given its present market power, or use its dominant market position to simply eliminate Relativity. Relativity refused to capitulate to Netflix's renegotiation demands some years ago, and since then Netflix has sought to send the message that dealing with it will be costly at every turn unless Relativity comes to heel. Relativity will not capitulate to Netflix, and it will not be cowed by its tactics. We will hold Netflix accountable for those tactics, with which the Bankruptcy Court is quite familiar and which have caused Relativity substantial financial stress as they were designed to do.

Relativity continues to require adherence to all provisions of the License Agreement, including Section 5.6. The provision permits Relativity to require Netflix to waive any right to setoff it may have for the benefit of the parties that have extended credit to Relativity against license fees owing by Netflix. That is the case here, where one party (Esalt Media Technologies, LLC (Pure Flix)) provided Relativity with the rights to the film in question in return for an interest in the license fees owing by Netflix with respect to the film, and another party (UltraV Holdings, LLC) provided factoring financing with respect to Relativity's remaining interest in the license fees. Accordingly, without in any way conceding that Netflix would otherwise have a right of setoff as to that receivable, Relativity hereby demands that Netflix waive any such rights.

---

[6] Relativity also asserted a claim against Netflix with respect to this conduct in Santa Clara Superior Court. The dismissal of some other causes of actions in that suit at Netflix's behest does not render the action a "failed state court complaint" as you suggest. While Relativity did not have the financial wherewithal to pursue its claim at that time, it reserves its right to do so.

10

      We also note that on May 23 Netflix will owe $622,049.36 in licensing fees to Relativity for the film *The Stray*, and will owe payments for other films thereafter.  Those must be paid when due for the same reason the license fee with respect to *A Question of Faith* should be paid, and because the automatic stay is now in place.  In addition, on April 30 Relativity provided Netflix notice of a September 1, 2018 start date for Netflix's window to stream the film *Samson*, but to date Netflix has failed to open its back lot for receipt of that film – which can be done electronically with the press of a button – despite two subsequent requests from Relativity to do so.  In the recent past, although I have had to send reminders to Netflix to open its backlot (even though there should have been no need to do so), Netflix has done so within about a day of receiving my reminder.  Instead, today I received an email from Netflix stating that this is now in the hands of Netflix's litigation group.  Until the backlot is opened, Relativity cannot deliver the film, and Netflix cannot raise any issues with respect to delivery for Relativity to be able to address before the start date.  There is no reason for the backlot not to be opened forthwith, and we ask that Netflix do so promptly.

      Relativity reserves any and all other rights and remedies it has against Netflix with respect to the matters discussed herein and the License Agreement.

      Very truly yours,

      Lori Sinanyan